UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

MARK WELLMAN,                          )
                                       )
                 Plaintiff,            )
                                       )
v.                                     )        Case No. 4:15 CV 1907 RWS
                                       )
ST. LOUIS COUNTY, et al.,              )
                                       )
                 Defendants.           )

## MEMORANDUM AND ORDER

This 42 U.S.C. § 1983 case arises from the St. Louis County Police Department's seizure and retention of Plaintiff Mark Wellman's firearms. Wellman claims the warrantless seizure and retention of his firearms violated his Fourth Amendment and due process rights, among others. Both parties move for summary judgment. For the reasons that follow, I will grant Defendants' motion.

## LEGAL STANDARD

In ruling on a motion for summary judgment, I must view the facts and inferences from the facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The moving party has the burden of establishing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Once the moving party has met this burden, the nonmoving party may not

rest on the allegations in its pleadings, but by affidavit or other evidence must set forth specific facts showing that a genuine issue of material fact exists. Fed. R. Civ. P. 56(c)(1), (e). "Where parties file cross-motions for summary judgment, each summary judgment motion must be evaluated independently to determine whether a genuine dispute of material fact exists and whether the movant is entitled to judgment as a matter of law." *Jaudes v. Progressive Preferred Ins. Co.*, 11 F.Supp.3d 943, 947 (E.D. Mo. 2014).

## FACTS

The following facts are undisputed unless otherwise indicated.

Wellman is a firefighter with the City of Hazelwood fire department. On December 25, 2014, Wellman was involved in a domestic violence incident with his wife that resulted in the police being called to Wellman's home. On December 28, 2014, Wellman was "down in the dumps" and felt very depressed. He testified that his wife had moved out of their home temporarily and he was concerned they may not resolve their problems. Wellman called his co-worker and friend, Gerard Hagedorn. During their conversation, Hagedorn expressed concern for Wellman and told Wellman he would send a police officer over to the house to check on him. Wellman testified he told Hagedorn not to send the police to his house as "nothing good" would come of it. Wellman told Hagedorn that if he sent the

police to Wellman's house, he would see Wellman on the news that night being carried out in a body bag.

Wellman's fire chief, David Radel, called 911 and reported that Wellman was home alone, probably very drunk, and wanted to commit suicide. Radel also reported that Wellman had several weapons in the home and had warned that no one had better call the police. Radel and Hagedorn gathered near Wellman's home with a couple other friends and co-workers of Wellman's.

The St. Louis County police were dispatched to Wellman's home. Sergeant Erich Von Almen spoke to Wellman on the phone for 10–15 minutes. During the conversation, Wellman's speech was slurred and he sighed a lot. Wellman and Sergeant Von Almen discussed the fact that Wellman owned firearms. Wellman told Sergeant Von Almen he knew the police would come in and take all his guns.

Wellman eventually came out of the house. Another officer on the scene, Jason Whiteside, observed that Wellman appeared intoxicated and exhibited mood changes. *See* Whiteside Deposition at 23, ECF No. 18–2 (explaining that Wellman "went from anger to crying, to anger to crying, to being completely normal in mood"). Officer Whiteside heard Wellman say, "I'm just not in my right mind; I haven't slept in a couple days." Def.'s Statement of Facts ¶ 64, ECF No. 25.

Wellman cooperated with the police and eventually agreed to go to the hospital for a mental health evaluation. Wellman told Sergeant Von Almen that

there were two guns by his chair in his living room. The parties disagree about whether Wellman gave consent to Sergeant Von Almen to enter his home. Sergeant Von Almen testified he did not think it was suitable to ask Wellman to sign a written consent form given his condition.

Wellman was taken to the hospital by ambulance and committed for a mental health evaluation. At Wellman's apparent request, one of his friends, Jim Mangan, stayed at his house and waited for Wellman's wife to arrive. After Wellman left for the hospital, Sergeant Von Almen entered Wellman's home and found two firearms sitting out by some chairs, as Wellman had described. Sergeant Von Almen testified that he made a judgment call and decided to take those firearms based on the reports of threats Wellman had made against himself. Sergeant Von Almen explained he did not know if Wellman would be released from the hospital immediately and was concerned about what might happen if he was released and still had the firearms. The firearms were taken by another officer to the station to be packaged for safekeeping.

After Sergeant Von Almen left Wellman's home, Mangan called the police and said he and Wellman's wife had located more guns and wanted the police to come back and take them. Officer Whiteside returned to the house. The parties disagree about who collected and stacked up Wellman's firearms, but they agree the firearms were stacked when Officer Whiteside arrived. Wellman's wife told

Officer Whiteside that she was worried about her husband's safety and her safety. Officer Whiteside testified that he removed the weapons at the direction of Mrs. Wellman and Mangan. Mrs. Wellman swears in an affidavit that she did not gather the firearms up or consent to police removing them from her home, though Mr. Wellman admits that Officer Whiteside acted upon the wishes of Mrs. Wellman. The police gave Mrs. Wellman a receipt detailing all the firearms that were seized sometime before Mr. Wellman was discharged from the hospital.

Wellman was released from the hospital after a few days. His employer advised him to go to an employee assistance program and required him to go to a doctor for an evaluation before he could return to work. Wellman testified that the doctor determined he was not a threat to himself or others and that he was allowed to return to work a few weeks after he was released from the hospital.

At some point, Wellman began trying to get his firearms back. The St. Louis County Police Department has a policy, Special Order 11-334 (the Special Order), that states that if a firearm has been seized in circumstances such as these, the owner must produce a writ of replevin or a medical letter from a treating physician stating the person is no danger to himself or others before the firearms will be released. The relevant portion of Special Order 11-334, titled "Release of Firearm Evidence," reads:

> If the firearm was seized pursuant to a suicide or the person was voluntarily or involuntarily committed to a mental health facility for

5

evaluation following a suicide intervention wherein a firearm was seized, a Writ of Replevin (a court order from a judge advising the Department to release the firearm) needs to be completed to authorize the release of the firearm. The Writ of Replevin is necessary unless the person from whom the firearm was seized produces a notarized written statement from a treating psychiatrist or a treating psychologist that states the health care provider is currently treating the person and that the person is in no danger to himself or to others and that the firearm should be returned to the person. Prior to the release of any firearm pursuant to either a Writ of Replevin or a medical letter from a treating psychiatrist/psychologist, approval will be received from the St. Louis County Counselor's Office.

Special Order 11–334 ¶ III.B.5, ECF No. 18–4. The Special Order also states that "[i]f there is any question in determining whether or not to authorize the release of a firearm, officers should contact a supervisor or the Property Control Unit for clarification." *Id.* ¶ III.B.6.

While the parties disagree about all of the steps Wellman took to try to get his firearms back, Wellman admits he knew about the requirements of the Special Order but refused to comply because he believes the policy is unconstitutional.[1] Rather than providing the police department with a letter from a psychologist or psychiatrist stating he is not a danger to himself or others, Wellman filed this lawsuit, seeking the return of his property plus damages and attorney's fees.

---

[1] On this record, it is not entirely clear what transpired between Wellman and the police when he requested the return of his firearms. Wellman cannot recall who he spoke to or when, and while he indicates he contacted the police multiple times, the record does not make clear what he was told and when he was first informed of the requirements of the Special Order. But Wellman does not claim he did not have notice of the procedure he had to follow to secure the release of his firearms. He admits he knew about the Special Order's requirements and explains he refused to comply because he believes the requirements are unconstitutional. As a result, any fact dispute about when he received notice or in what form is not material to the claims before me.

## CLAIMS

Wellman's complaint alleges violations of his rights in seven counts: (1) Fourth Amendment unreasonable search and seizure; (2) due process; (3) conspiracy; (4) Second Amendment right to keep and bear arms; (5) Fifth Amendment taking; (6) Missouri Revised Statute § 21.750; and (7) Article I, Section 23 of the Missouri Constitution. Wellman sues St. Louis County and Jon Belmar, Chief of Policy of St. Louis County, in his individual capacity.[2]

Both parties moved for summary judgment.[3] Wellman did not brief a number of his claims. At the March 23, 2017 status conference held in this case, Wellman confirmed that he had fully briefed the relevant issues in the case and had abandoned his Second Amendment and conspiracy claims. Wellman did not brief his claim under Article I, Section 23 of the Missouri Constitution—which also deals with the right to keep and bear arms—and I will consider that claim abandoned. Wellman mentioned his Fifth Amendment taking claim in his summary judgment motion, but he did not develop the argument in any meaningful way that would allow me to address it, so I will also consider that claim

---

[2] Wellman initially also sued Jeff Fuesting, a police captain for the St. Louis County Police Department, and the City of Jennings, but voluntarily dismissed those defendants.

[3] Defendants filed their motion for summary judgment after the deadline set in the case management order, which Wellman objected to. At the March 23, 2017 status conference, I granted leave for Defendants' late motion and informed the parties that I intended to treat their submissions as cross-motions for summary judgment on all claims. Both parties stated they had fully briefed all relevant issues and did not wish to submit additional briefing.

abandoned.[4]  As a result, I will only address Wellman's first, second, and sixth counts.

At an April 6, 2017 status conference, the parties submitted an agreed-upon order for the return of Wellman's firearms.  I entered that order by the parties' consent.  As a result, the return of Wellman's firearms is no longer at issue.  At that status conference, Wellman indicated he still seeks damages for the loss of use of his property for several years and will seek attorneys' fees and costs associated with their return.  Both parties confirmed that they consider the matter fully briefed and declined the opportunity to submit additional briefing.  I will address Wellman's remaining damages claims.

## ANALYSIS

### I.    Fourth Amendment unreasonable search and seizure

Wellman argues he is entitled to summary judgment on his Fourth Amendment claim because the warrantless entries into his home and seizure of his firearms violated his right to be free from unreasonable search and seizures.

---

[4] Wellman's summary judgment motion has a heading that states that Defendants' reliance on the Special Order to retain his firearms is a violation of his Fifth Amendment rights and is a taking. But the analysis that follows does not address his takings claim.  Rather, it addresses two arguments that the Special Order is preempted by or violates state statutes, claims I discuss later in this memorandum and order.  The Eighth Circuit has made clear that I do not even have jurisdiction over a takings claim unless there is a "'final decision' with respect to the property at issue" and the aggrieved party has sought "'compensation through the procedures the State has provided for doing so.'"  *Dahlen v. Shelter House*, 598 F.3d 1007, 1010 (8th Cir. 2010) (quoting *Williamson Cnty. Reg'l Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 186, 194 (1985)). Wellman has not addressed these requirements.  The parties agreed that his property would be returned to him.

Wellman did not sue any of the officers involved in the seizures. Defendants argue Wellman's Fourth Amendment claim fails because Wellman has not shown Chief Belmar was personally involved in the seizure of Wellman's firearms or that the seizure occurred per any official municipal policy or custom.

Defendants are entitled to summary judgment on the claim against Chief Belmar. "Government officials are personally liable only for their own misconduct." *S.M. v. Krigbaum*, 808 F.3d 335, 340 (8th Cir. 2015). "Liability under § 1983 requires a causal link to, and direct responsibility for, the deprivation of rights." *Madewell v. Roberts*, 909 F.2d 1203, 1208 (8th Cir. 1990)). "[T]here is no concept of 'supervisory strict liability' in § 1983 actions. Instead, for a supervisor to be held liable for the acts of a subordinate, something more must be shown than merely the existence of the supervisor-subordinate relationship." *Clay v. Conlee*, 815 F.2d 1164, 1170 (8th Cir. 1987) (internal citation omitted). Wellman has not alleged or presented any evidence that indicates Chief Belmar was personally involved in or directly responsible for the entries into his home or seizures of his firearms. Wellman does not claim Chief Belmar failed to train, supervise, or control his officers. As a result, Defendants are entitled to summary judgment on this claim against Chief Belmar. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986) ("[T]he burden on the moving party may be discharged by

'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case.").

Defendants are also entitled to summary judgment on this claim against St. Louis County. "Section 1983 liability for a constitutional violation may attach to a municipality if the violation resulted from (1) an official municipal policy, (2) an unofficial custom, or (3) a deliberately indifferent failure to train or supervise." *Atkinson v. City of Mountain View*, 709 F.3d 1201, 1214 (8th Cir. 2013) (quotation marks and citations omitted). "[A] municipality may not be found liable 'unless action pursuant to official municipal policy of some nature caused a constitutional tort.'" *Szabla v. City of Brooklyn Park*, 486 F.3d 385, 389 (8th Cir. 2007) (en banc) (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978)). "[A] 'policy' is an official policy, a deliberate choice of a guiding principle or procedure made by the municipal official who has final authority regarding such matters." *Mettler v. Whitledge*, 165 F.3d 1197, 1204 (8th Cir. 1999). "[A] municipality cannot be held liable on a *respondeat superior* theory, that is, solely because it employs a tortfeasor." *Szabla*, 486 F.3d at 389. "However, a municipality may be held liable for the unconstitutional acts of its officials or employees when those acts implement or execute an unconstitutional municipal policy or custom." *Mettler*, 165 F.3d at 1204. "For a municipality to be liable, a plaintiff must prove

that a municipal policy or custom was the 'moving force [behind] the constitutional violation.'" *Id.* (quoting *Monell*, 436 U.S. at 694).

Wellman argues there is "no dispute" his firearms were seized per an official policy, Special Order 11–334. The parties do agree that the Special Order governed the return of Wellman's firearms. But Special Order 11–334—titled "Release of Firearm Evidence"—lays out "procedures to follow when authorizing the *release* of seized firearm evidence," not principles or procedures to follow when deciding whether to seize firearms. *See* Special Order 11–334 ¶ I, ECF No. 18–4 (emphasis added). The relevant section, III.B.5, does not discuss *when* officers should seize firearms during a suicide intervention but rather details the procedure for *releasing* firearms that were seized in a suicide intervention if the person was then committed to a mental health facility for evaluation.

Wellman has not identified or presented any evidence of an official policy establishing guiding principles or procedures St. Louis County police officers are to follow when seizing firearms in a suicide intervention. He also has not argued or presented any evidence of a pattern of unconstitutional misconduct or a deliberately indifferent failure to train, supervise, or otherwise act. *See Mettler*, 165 F.3d at 1204 (concluding plaintiff's *Monell* claim failed where she failed to identify any official policy that arguably played a role in the alleged constitutional deprivation and failed to show the existence of a widespread pattern of

unconstitutional misconduct); *Atkinson*, 709 F.3d at 1216 ("Because there is no evidence of a facially unlawful city policy or custom, [plaintiff] could prove his case to a reasonable jury only if he could demonstrate some municipal action or inaction, taken with deliberate indifference as to its known or obvious consequences, caused his injuries." (quotation marks and citation omitted)). Because Wellman has not presented any evidence showing that a municipal policy or custom was the moving force behind the alleged Fourth Amendment violation, St. Louis County is entitled to judgment as a matter of law on this claim.

## II.  Due process

Wellman raises two due process theories: (1) Special Order 11–334 is unconstitutionally vague, and (2) his procedural due process rights were violated on three occasions—the two separate seizures of his firearms and their continued retention—because he did not receive pre-deprivation process before their seizure and because the available post-deprivation remedy was inadequate.

### a.  Vagueness

Wellman argues the Special Order is unconstitutionally vague because it leaves the final decision of whether firearms will be returned to an unnamed person in the St. Louis County Counselor's Office, with no procedures or criteria in place to evaluate or process a request for a return of firearms.  The relevant provision explains a person must obtain a writ of replevin or a medical letter and that "[p]rior

to the release of any firearm pursuant to either a Writ of Replevin or a medical letter from a treating psychiatrist/psychologist, approval will be received from the St. Louis County Counselor's Office." Special Order 11–334 ¶ III.B.5, ECF No. 18–4. Defendants argue that the Special Order is clear and state that a firearm seized in the circumstances described "will always be returned to the owner" when a medical letter is received or when a judge issues a writ of replevin. *See* Resp. to Pl.'s 2nd Req. for Produc. ¶ 3, ECF No. 18–5.

A regulation or enactment is void for vagueness if it fails "(1) to define the offense with sufficient definiteness that ordinary people can understand prohibited conduct; and (2) to establish standards to permit police to enforce the law in a non-arbitrary, non-discriminatory manner." *Woodis v. Westark Cmty. Coll.*, 160 F.3d 435, 438 (8th Cir. 1998). Assuming the vagueness doctrine applies here, on this record, I do not find the Special Order unconstitutionally vague.

Wellman challenges the provision stating that prior to the release of firearms per a writ of replevin or medical letter, "approval will be received from the St. Louis County Counselor's Office." Special Order 11–334 ¶ III.B.5, ECF No. 18–4. He argues that because the Special Order does not detail specific procedures the Counselor's Office follows in approving release, it is unconstitutionally vague. I disagree. The Special Order makes reasonably clear the process involved in the release of firearms and what Wellman needs to do to comply. Wellman provides

no authority that supports requiring the police department to spell out every step in internal decision-making to withstand constitutional review.  Wellman never sought return of his firearms per a writ of replevin or medical letter, presents no evidence that the Special Order is applied in an arbitrary or discriminatory manner, and presents no basis for recovering damages on this theory.  As a result, Defendants are entitled to summary judgment on this claim.

### b. Procedural due process

In response to Defendants' motion for summary judgment, Wellman argues he suffered violations of his procedural due process rights when the police seized his firearms and then refused to return them, all without affording him pre-deprivation process.  He argues that no post-deprivation remedy could be adequate because his firearms were seized and retained per official policy, the Special Order.  He also argues that even if I consider the adequacy of the remedy provided by the Special Order, it fails because it does not afford him the process required: notice, a hearing with an impartial decision maker, the right to confront adverse witnesses, and a decision on the record.

"To set forth a procedural due process violation, a plaintiff, first, must establish that his protected liberty or property interest is at stake.  Second, the plaintiff must prove that the defendant deprived him of such an interest without due process of law."  *Gordon v. Hansen*, 168 F.3d 1109, 1114 (8th Cir. 1999) (per

curiam) (citation omitted). "The requirements of due process are not rigid; rather, they 'call[] for such procedural protections as the particular situation demands.'" *Mickelson v. Cnty. of Ramsey*, 823 F.3d 918, 924 (8th Cir. 2016) (quoting *Greenholtz v. Inmates of Neb. Penal & Corr. Complex*, 442 U.S. 1, 12 (1979)). "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Schmidt v. Des Moines Pub. Sch.*, 655 F.3d 811, 817–18 (8th Cir. 2011) (quotation marks omitted).

To evaluate available process, I must balance "first, 'the private interest that will be affected by the official action;' second, 'the Government's interest;' and third, 'the risk of an erroneous deprivation of [the private] interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards.'" *Wallin v. Minnesota Dep't of Corr.*, 153 F.3d 681, 690 (8th Cir. 1998) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)).

Here, the private interest affected is the use and possession of property. Neither party disputes that Wellman has a property interest in his firearms that entitles him to process. But while this property interest is significant, the temporary deprivation of firearms following a suicide intervention is not comparable to "the kinds of government conduct that have required a predeprivation hearing," such as those that involve "the cessation of essential

services for any appreciable time[, which] works a uniquely final deprivation."
*See Mickelson*, 823 F.3d at 924 (quotation marks omitted) (alteration in original).

The police had a substantial interest in acting quickly to remove the firearms and in retaining them until they could ascertain the danger had passed. The police had reason to believe Wellman posed a danger to himself and was threatening suicide in a home where he had firearms. They also had reason to believe his alleged suicidality was caused by domestic difficulties with his wife, with whom he had an altercation days earlier that resulted in a police response. Wellman's wife expressed concern for Wellman's safety and her own. Though Wellman had left for the hospital when the police seized his firearms, the police did not know how quickly or in what condition he would return.

In these circumstances, St. Louis County had "a critical interest in empowering its police officers to remove objects 'dangerous in themselves,' including lethal firearms, from the premises." *Richer v. Parmelee*, 189 F.Supp.3d 334, 340 (D.R.I. 2016) (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 471 (1971)); *cf. Sutterfield v. City of Milwaukee*, 751 F.3d 542, 568–70 (7th Cir. 2014) (in the Fourth Amendment context, explaining it was "natural, logical, and prudent" for the police to believe they should seize a firearm from a suicidal person's home without a warrant even after she had been taken to the hospital and noting that "[o]ne need only imagine the public outcry that would have taken place

had the police left the gun where it was and had [plaintiff] returned home and then used the gun to take her own life . . . to see the wisdom in what the police did"). In these circumstances, I conclude that the police's interest in protecting the safety of Wellman and others weighs more heavily than Wellman's interest in uninterrupted possession of his property. *Cf. Mora v. City of Gaithersburg*, 519 F.3d 216, 223 (4th Cir. 2008) (noting in the Fourth and Fourteenth Amendment context that "[p]rotecting the physical security of its people is the first job of any government").

In addition to this balancing, I must also consider "'the likelihood of an erroneous deprivation of the private interest involved as a consequence of the procedures used.'" *Mickelson*, 823 F.3d at 926 (quoting *Mackey v. Montrym*, 443 U.S. 1, 13 (1979)). Wellman has not presented any evidence of a policy or any criteria the Defendants direct police to follow when deciding whether to seize firearms in a suicide intervention. The circumstances here—including the danger presented, the uncertainty regarding Wellman's return, and Wellman's condition at the time—required "quick action by the State," *see Mickelson*, 823 F.3d at 928, and did not make pre-deprivation process practical. *See Richer*, 189 F.Supp.3d at 342 n.8 (examining only the adequacy of post-deprivation remedies where firearms were seized in a suicide intervention, explaining that in these circumstances, a pre-deprivation hearing would have been "practically inconceivable").

Once police seized the firearms, the particular provision at issue applied only if a firearm was seized per a suicide or per a suicide intervention where the person was committed to a mental health facility for evaluation. Wellman could retrieve his firearms by either filing a state court action for replevin or submitting a letter from a treating physician of his choosing stating he no longer posed a danger to himself or others. The option of submitting a medical letter would seem to leave very little risk of erroneous deprivation and offered Wellman a meaningful opportunity to be heard that is not overly burdensome and still protects public safety. Wellman has not argued that this requirement "is so cumbersome as to undermine the constitutional adequacy of this post-deprivation . . . process," *Mickelson*, 823 F.3d at 927, or suggested any additional or substitute procedural safeguards that would serve better. The police department's interest in protecting public safety outweighs the inconvenience to Wellman in having to act to retrieve his firearms and the temporary deprivation of his property. As a result, I conclude that the *Mathews* factors show that a pre-deprivation hearing was not required and that post-deprivation process may suffice. *See id.*

Wellman argues that two Eighth Circuit decisions—*Lathon v. City of St. Louis* and *Walters v. Wolf*—mandate a conclusion that any post-deprivation remedy is inherently insufficient in these circumstances. *See Lathon v. City of St. Louis*, 242 F.3d 841 (8th Cir. 2001), and *Walters v. Wolf*, 660 F.3d 307 (8th Cir.

2011). They do not. In *Lathon*, police seized firearms from plaintiff per a valid search warrant but then refused to return them, absent a court order, even after it became clear the firearms were not contraband or needed as evidence and no criminal charges were to be filed. In *Walters*, the plaintiff's firearm was seized per a valid arrest. The plaintiff demanded the return of his firearm on several occasions, but though all charges against him had been dismissed or resolved, the chief of police refused to return the firearm without a court order.

In both cases, the Eighth Circuit concluded that two separate deprivations had occurred: the first, valid deprivation per a warrant or arrest, and a second, invalid deprivation that occurred when something changed (police determined the weapons were not contraband or evidence, criminal charges were dropped or resolved), with the result that the police no longer had a legal basis to retain the weapons. *See Walters*, 660 F.3d at 314 ("A second deprivation occurred requiring a new due process analysis when the defendants, with no legal grounds, refused to return Walter's property."); *Lathon*, 242 F.3d at 843 ("The pivotal deprivation in this case was not the initial seizure of the ammunition and weapons, but the refusal to return them without a court order after it was determined that these items were not contraband or required as evidence in a court proceeding."). In both cases, because the second deprivation occurred per official policy, when the police no longer had grounds to hold the firearms, and without "attendant exigencies

prohibiting or making impractical a reasonable predeprivation process," *Walters*, 660 F.3d at 314, the court concluded that available post-deprivation process would not suffice. *See id.* at 315; *Lathon*, 242 F.3d at 843–44.

These holdings turned both on the "second" deprivation—at which point something had changed and the police no longer had reason to hold the firearms— and, as the Eighth Circuit later explained in *Mickelson v. County of Ramsey*, on "the inherently 'lengthy and speculative' nature of the post-deprivation remedy available—an action in tort." *Mickelson*, 823 F.3d at 928 (quoting *Walters*, 660 F.3d at 313–14); *see also Lathon*, 242 F.3d at 844 (explaining that even if a post-deprivation remedy could suffice, the court would not find the one available adequate because the plaintiff's firearms had been distributed among four different Missouri counties and the plaintiff's only recourse was to file four separate replevin actions to secure the return of his weapons). "Our court since has suggested that post-deprivation administrative remedies are innately distinguishable," a reading "consistent with the fact that our decision in *Walters* made much of the city's failure to afford *any* independent administrative process through which an arrestee could contest the city's retention of his property, even after the dismissal of charges." *Mickelson*, 823 F.3d at 928. In some cases, then, "post-deprivation process may suffice, even when the deprivation occurs pursuant to established state policy." *Id.*

In this case, the police seized Wellman's firearms because they had reason to believe he posed an immediate danger to himself, circumstances that "prohibit[] or mak[e] impractical a reasonable predeprivation process." *See Walters*, 660 F.3d at 314–15. Unlike *Lathon* and *Walters*, this was not a criminal case where the police no longer had reason to hold the firearms, resulting in a second, "constitutionally impermissible deprivation." *Cf. Walters*, 660 F.3d at 315. Here, the police seized Wellman's firearms in a situation in which pre-deprivation process was not practical and then had a process in place to challenge the deprivation and determine whether the danger had passed. The process available did not leave Wellman only a "lengthy and speculative" tort action but offered him a seemingly certain and relatively simple option for retrieving his firearms. Because of these differences, *Lathon* and *Walters* do not "foreclose the possibility that an adequate post-deprivation process may satisfy the Fourteenth Amendment in a case such as this one." *Mickelson*, 823 F.3d at 928.

"Of course, for the specific post-deprivation remedy in place to satisfy due process, the remedy must be adequate." *Mickelson*, 823 F.3d at 929. The process available seems to have given Wellman a meaningful and relatively non-burdensome way to challenge the deprivation and retrieve his property. As noted, the Special Order afforded Wellman a significantly more predictable and less cumbersome process than the "lengthy and speculative" tort actions rejected in

*Lathon* and *Walters*.  On its face, the Special Order would seem to give Wellman an opportunity to be heard at a meaningful time and in a meaningful manner.  *See Schmidt*, 655 F.3d at 817–18.  Contrary to Wellman's argument, the requirements of due process are not "rigid," but rather "call[] for such procedural protections as the particular situation demands."  *See Mickelson*, 823 F.3d at 924 (quotation marks omitted).  Wellman speculates that even if he had complied with the Special Order, he may not have gotten his property back.  But he admits he did not present a writ of replevin or medical letter, and "[a]bsent his exhaustion of the available process, we cannot know whether the current system would fail to yield a return" of his firearms.  *Mickelson*, 823 F.3d at 930.

In sum, in consideration of the balancing of interests of Wellman and the Defendants, the process afforded Wellman, and Wellman's inability to demonstrate any inadequacies in the available process due to his refusal to use it, I conclude that his procedural due process claim fails as a matter of law.  As a result, and in light of the balancing of all of the *Mathews* factors, I conclude Defendants are entitled to summary judgment on this claim.

## III.    Violation of Mo. Rev. Stat. § 21.750

Finally, Wellman claims that Mo. Rev. Stat. § 21.750—which deals with firearms legislation preemption by the Missouri general assembly—preempts Special Order 11–334.  Wellman argues the Missouri State Legislature has

preempted all other entities, including St. Louis County, from passing any ordinances, regulations, or special orders that pertain to firearms rights.

Wellman's claim that the Special Order violates state law is not a cognizable § 1983 claim and requires that I exercise supplemental jurisdiction. *See Wax 'n Works v. City of St. Paul*, 213 F.3d 1016, 1019 (8th Cir. 2000) ("It is well settled, however, that § 1983 may be an avenue for relief only when a plaintiff asserts that violation of *federal* rights have occurred."); *Bagley v. Rogerson*, 5 F.3d 325, 328 (8th Cir. 1993) ("[A] violation of state law, without more, does not state a claim under the federal Constitution or 42 U.S.C. § 1983."). I will decline to exercise supplemental jurisdiction. Wellman does not indicate whether Missouri courts have addressed the issue he raises, and given that I have dismissed all the claims over which I have original jurisdiction, I do not find it appropriate to address this important question of state law. *See* 28 U.S.C. § 1367(c). As a result, I will dismiss this claim without prejudice.[5]

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiff Mark Wellman's Motion for Summary Judgment #[18] is **DENIED.**

---

[5] Though not raised as a separate claim in his Complaint, Wellman also argues in his summary judgment motion that Mo. Rev. Stat. § 571.012—which deals with disclosure of patient firearm information by health care professionals—makes it illegal for him to comply with Special Order 11–334. To the extent Wellman has properly raised this claim, it is also a state law claim over which I will not exercise jurisdiction.

**IT IS FURTHER ORDERED** that Defendants St. Louis County's and Jon Belmar's Motion for Summary Judgment #[23] is **GRANTED**.

**IT IS FURTHER ORDERED** that Plaintiff's claim under Mo. Rev. Stat. § 21.750 is **DISMISSED** without prejudice.

**IT IS FURTHER ORDERED** that Plaintiff's other claims are **DISMISSED** with prejudice.

RODNEY W. SIPPEL
UNITED STATES DISTRICT JUDGE

Dated this 8th day of June, 2017.